**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff

vs.                                       3:07-cr-112-J-33TEM

WALTER B. LEWIS,

    Defendant.

_____

## REPORT AND RECOMMENDATION[1]

This matter is before the undersigned on Defendant's Motion to Suppress Property Seized (Doc. #58, Motion) and the government's response in opposition thereto (Doc. #62). A hearing was held before the undersigned on February 5, 2008. A transcript of the proceedings has been filed. (Doc. #65). Based on the testimony and evidence presented at the hearing, Defendant's Motion is hereby **DENIED** for the following reasons.

### I. Background

In late 2006, narcotics detective Charles Bates (Bates) of the Jacksonville Sheriff's Office (JSO) began investigating Defendant Walter B. Lewis based on information obtained from an informant drug distributer by the name of Robert Heck (Heck) who was apprehended near Macon, Georgia while in route to a cocaine purchase in Atlanta. (Doc. #65 at 11). Bates testified that Heck revealed to Bates that he brought cocaine to

---

[1] Any party may file and serve specific, written objections hereto within TEN (10) DAYS after service of this Report and Recommendation. Failure to do so shall bar the party from a *de novo* determination by a district judge of an issue covered herein and from attacking factual findings on appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a); Local Rule 6.02(a), United States District Court for the Middle District of Florida. The parties, however, have a greed to a shortened response period of FIVE (5) days. (Doc. #65 at 148).

Jacksonville, Florida from Atlanta, Georgia on prior occasions and distributed it to Defendant. (Doc. #65 at 11-12). Bates further testified that Heck agreed to record conversations with Defendant and arrange a large cocaine transaction with Defendant. (Doc. #65 at 11-14).

Either on February 10, 2007 or February 11, 2007, Heck informed Bates that he spoke with Defendant, who advised Bates that he wanted to purchase ten (10) kilograms of cocaine for $100,000. (Doc. #65 at 16). The aforementioned conversation was not recorded by Bates because Bates and the narcotics task force were not present at the time the conversation occurred. (Doc. #65 at 16). Bates, however, devised a plan to intercept Defendant while Defendant was en route to meet Bates for the purpose of purchasing the aforementioned ten (10) kilograms of cocaine. (Doc. #65 at 16).

On February 12, 2007, Bates instructed Heck to contact Defendant and arrange the aforementioned cocaine transaction. (Doc. #65 at 16). Heck followed Bates' instructions and made three separate telephone calls to Defendant. All three calls were recorded by Bates. (Doc. #65 at 17-18; Plaintiff's Exhibits 1, 1(A), 1(B), and 1(C)). The purpose of the telephone calls was to arrange and facilitate a meeting between Heck and Defendant at a predetermined location.[2]

After the initial call was made by Heck to Defendant, Bates set up surveillance at Defendant's residence. (Doc. #65 at 16).

---

[2] The undersigned notes that the audio-recordings of the three aforementioned telephone calls were entered into evidence and played during the hearing. The audio-recordings indicate that Heck and Defendant were planning to meet at a predetermined location. (Plaintiff's Exhibits 1, 1(A), 1(B), and 1(C)).

**A. The February 12, 2007 Traffic Stop**

On February 12, 2007, after surveillance was set up at Defendant's residence, Defendant was observed arriving at his residence to drop his child off from school.  (Doc. #65 at 16).  During his second conversation with Heck, Defendant indicated that he had to pick up his son and drop him off at his residence before commencing the drug transaction. (Exhibit 1(B); *see also* Doc. #65 at 25).  After Defendant arrived at his residence to drop off his son, he briefly went inside his residence before exiting the residence and entering a black truck.  (Doc. #65 at 26-28).  Defendant was then observed leaving his residence in the black truck and proceeding to drive in the direction of the predetermined cocaine transaction location.  (Doc. #77).

Bates then contacted police officer Donald Bishop (Bishop), who is assigned to the JSO narcotics task force and whose duties include assisting the JSO narcotics unit when needed, and told him to go to Edgewood Avenue and wait for the black truck to pass. (Doc. #65 at 26-28).  Bishop was advised by Bates that he should follow the black truck and look for probable cause to stop the vehicle because Bates had reason to believe the vehicle was en route a drug transaction and that it contained a large amount of cash.  (Doc. #65 at 26-29).

Bishop, who was in uniform and in a marked patrol car, observed Defendant's vehicle on Edgewood Avenue and began to follow it.  (Doc. #65 at 29).  Bishop testified that once he was behind the Defendant's vehicle he noticed it had an expired tag, which is a violation of Florida Statutes Section 320.07.  (Doc. #65 at 85).  Bishop stated that he then proceeded to stop the vehicle.  (Doc. #65 at 85).

After stopping Defendant, Bishop advised Defendant that he had been stopped due to the expired tag.  (Doc. #65 at 87).  Bishop, who testified as to having extensive drug recognition and investigative training, stated that he detected the odor of marijuana emanating from Defendant's vehicle.  (Doc. #65 at 79-82).  Bishop further stated that after he advised Defendant that he smelled marijuana, Defendant did not deny that the vehicle may have smelled like marijuana but merely maintained that the vehicle was a work truck and that other individuals drove the vehicle besides himself.  (Doc. #65 at 88, 129).

Bishop next asked Defendant if there was any contraband in the vehicle and Defendant responded in the negative.  (Doc. #65 at 88).  Bishop stated that he then asked Defendant for consent to search the vehicle and that Defendant acquiesced. (Doc. #65 at 88).  Bishop further testified that, although he smelled marijuana emanating from the vehicle, Defendant did not appear to be under the influence of narcotics.  (Doc. #65 at 89).

Bishop subsequently searched Defendant's truck and located a bag on the rear floorboard of the vehicle which contained a large sum of money folded in what he recognized to be $1,000 "drug folds."  (Doc. #65 at 93).  Bishop then contacted Bates and informed him that he found a large sum of money in Defendant's truck.  (Doc. #65 at 95). Bates immediately responded to the scene and spoke with Defendant.  (Doc. #65 at 95). Bates advised Defendant that when large amounts of money are found the narcotics unit likes to interview the person in possession of the money.  (Doc. #65 at 31).  Bates asked if Defendant would go back to the narcotics office to be interviewed and Defendant agreed. (Doc. #65 at 31).  Bishop then issued a traffic citation to Defendant for the expired tag that was a violation of Florida Statutes Section 320.07.  (Doc. #65 at 96-97).

At the narcotics office, Bates advised Defendant of his Miranda rights and asked him to sign a waiver of constitutional rights form.  (Doc. #65 at 33).  Additionally, Defendant was informed that he was free to leave at any time during the interview.  (Doc. #65 at 35). Defendant indicated that he understood his rights and signed the waiver form.  (Doc. #65 at 31-35).  Defendant proceeded to tell Bates that the money, which totaled $100,000, was inside the bag because he was en route to a bank and that it was his savings.  Detective Bates advised Defendant that the money was going to be seized and then provided Defendant with a receipt and a form for contesting the seizure if he could show that the money came from a legitimate source.   (Doc. #65 at 31-35).  Defendant subsequently left the narcotics office on his own accord.

**B. The March 29, 2007 Traffic Stop**

Approximately one month after the February 12, 2007 stop, Defendant told Heck that he wanted to purchase two kilograms of cocaine.  (Doc. #65 at 36, 45-47; Exhibits 4, 4(A), 4(B), 4(C)).  On March 29, 2007, Heck agreed to meet Defendant at the same location as before.  (Doc. #65 at 48-49).  Bates, once again, established surveillance at Defendant's residence and noticed a black Chevrolet Monte Carlo enter the driveway.  (Doc. #65 at 49). Defendant was then observed carrying a bag of dog food from behind his residence and entering the black Monte Carlo.  (Doc. #65 at 49). The Monte Carlo subsequently left the residence and proceeded down Edgewood Avenue, in the direction of the arranged drug purchase location.  (Doc. #65 at 50).

Bates, again, contacted Bishop and advised him to look for a black Chevrolet Monte Carlo.  (Doc. #65 at 49-50, 99-100).  Bates told Bishop that he believed the Monte Carlo was en route to a drug deal with a large amount of cash and to look for probable cause to

stop the vehicle.  (Doc. #65 at 99-101).  Bishop saw the described vehicle, followed it, and noticed that it had a broken right mirror.  (Doc. #65 at 101).  Bishop stopped the vehicle for a faulty equipment violation pursuant to Florida Statutes Section 316.610 and approached the driver and owner of the vehicle, John Winn (Winn).  (Doc. #65 at 101-02).  Bishop informed Winn of why he had been stopped and asked Winn for his driver's license and registration.  (Doc. #65 at 102).  Bishop observed that Winn appeared nervous.  (Doc. #65 at 104).  Specifically, Bishop noticed Winn's hands were shaking as he handed over his license and registration and that a vein on Winn's neck was protruding and "jumping." (Doc. #65 at 104).

Bishop asked Winn if there were any drugs or large sums of money in the vehicle and Winn replied that there was a large amount of cash in a dog food bag behind the seat. (Doc. #65 at 104).  Bishop then asked Winn if he could search the vehicle.  (Doc. #65 at 104).  Bishop testified that Winn gave him consent to search the bag and the vehicle. (Doc. #65 at 104).  Inside the bag, Bishop found a large amount of money wrapped in what he recognized to be $1,000 drug folds.[3]  (Doc. #65 at 107).

Bishop, again, called Bates, who immediately arrived at the scene of the traffic stop. (Doc. #65 at 107).  Bates asked Defendant if he had any knowledge of the money and Defendant denied any knowledge of the money and further denied knowing that it was inside the vehicle.  (Doc. #65 at 52).

---

[3] In his Motion, Defendant maintains that the amount of money seized on March 29, 2007 was $38,960.  (Doc. #58 at 1).

## II. Discussion

Defendant moves to suppress the money seized from him on February 12, 2007 and the money seized from Winn on March 29, 2007, arguing that the vehicle stops were pretextual in violation of the Fourth Amendment and secondly, that the search of the vehicles was in violation of the Fourth Amendment because consent was never given. Alternatively, Defendant argues that there was no probable cause to search any of the vehicles in question because there was no reason for the officers to believe the vehicles were being used to facilitate a drug transaction since the police informant was untrustworthy.[4] All of Defendant's arguments fail, however, for the following reasons.

### A. Whether the Traffic Stop on February 12, 2007 was Pretextual

As a preliminary matter, the undersigned notes that Defendant has standing to contest both the seizure and subsequent search, which occurred on February 12, 2007, since he was the owner and sole occupant of the vehicle stopped. *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Additionally, the undersigned notes that, at the hearing, Defendant neither testified, nor produced any witnesses in his favor.

Concerning the alleged pretextual nature of the February 12, 2007 traffic stop, Defendant argues the stop was pretextual because the police had an ulterior reason for stopping Defendant's vehicle besides the expired tag traffic violation.

The subjective motivation of a police officer in making a traffic stop, however, is irrelevant so long as the police have probable cause to stop the vehicle. "The Supreme

---

[4] Although Defendant originally moved to suppress monies seized from an August 15, 2006 stop of an individual named Leonard Graham, Defendant stipulated that he does not have standing to contest the aforementioned seizure in light of the fact that he was not even present during this seizure. (Doc. #65 at 4-5).

Court and this Court [the Eleventh Circuit Court of Appeals] previously rejected the use of such pretextual-stop analysis and concluded that ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred. *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (*citing Whren v. United States*, 517 U.S. 806, 812-13 (1996)). Moreover, the Eleventh Circuit in *United States v. Holloman*, 113 F.3d 192 (11th Cir. 1997), concluded that because the police in that case possessed probable cause to believe that a traffic violation had occurred, the stop of the vehicle complied with the Fourth Amendment regardless of their subjective desire to intercept drugs.

A stop is reasonable if the police have probable cause to believe a traffic violation has occurred, *Whren*, 517 U.S. at 810, or have an "articulable and reasonable suspicion" that the driver has violated the law, *Delaware v. Prouse*, 440 U.S. 648 (1979).

In the instant case, the undisputed evidence of record indicates that Defendant was driving with an expired tag on his vehicle and that, because of this, he was pulled over and issued a traffic citation for violating Florida Statutes Section 320.07. (Exhibit #2). Therefore, because Bishop possessed probable cause to believe that a traffic violation had occurred (*i.e.* observing an expired tag in violation of a Florida statute), the initial stop of Defendant's vehicle was lawful; thus, the stop complied with the Fourth Amendment regardless of Bishop's subjective desire to intercept money intended to be used to purchase drugs.

Defendant made an additional argument at the hearing that the facts of this case are similar to the facts in *Knowles v. Iowa*, 525 U.S. 113 (1998) and, thus, the search of Defendant's vehicle was unlawful. In *Knowles*, the Supreme Court held unconstitutional an Iowa state supreme court decision that allowed an individual to be searched incident to

a traffic citation regardless of whether or not they are, in fact, arrested because an Iowa statute provided for the arrest of any individual who violates any state traffic law. *Id.* The Iowa supreme court held that, since the state statute provided for the arrest of an individual for violating any state traffic law, an individual could lawfully be searched incident to a traffic citation, as if they were being searched incident to arrest, regardless of whether they are actually taken into custody. *Id.* The Supreme Court did not agree with the Iowa supreme court's line of reasoning and reversed its interpretation of the Iowa statute as unconstitutional. *Id.*

Here, we do not have a search incident to citation because, unlike the defendant in *Knowles*, the Defendant in this case gave Bishop consent to search his vehicle. Although Defendant avers that he did not give consent in his Motion, Defendant has provided no evidence to support this contention. In fact, Defendant did not even argue at the hearing that he did not give Bishop consent to search his vehicle.

Accordingly, and for the aforementioned reasons, the undersigned finds the February 12, 2007 traffic stop was neither pretextual, nor unlawful, and that the stop was reasonable under the Fourth Amendment.

## A. Whether the Traffic Stop on March 29, 2007 was Pretextual

The undersigned notes that Defendant has standing to contest the March 29, 2007 seizure of the vehicle, but not the search of the vehicle. Defendant was a passenger in a vehicle seized by the state; therefore, he was seized along with the driver and he may challenge the seizure of the vehicle under the Fourth Amendment. *Brendlin v. California*, 127 S. Ct. 2400 (2007). However, since Defendant was merely a passenger of the Monte Carlo and does not claim a proprietary interest in the monies seized during the March 29,

2007 stop, Defendant does not have standing to contest the search of Winn's Monte Carlo. *See Rakas*, 439 U.S. 128.   Moreover, Bishop testified that Winn gave him consent to search his vehicle during the March 29, 2007 stop, and no evidence to the contrary has been produced.

Additionally, the undersigned notes that Defendant makes essentially the same arguments he made in alleging the February 12, 2007 traffic stop was pretextual in support of his Motion as it relates to the March 29, 2007 stop.   Defendant, however, does make some additional arguments.   For instance, in support of his contention that the March 29, 2007 stop was pretextual, Defendant points to the fact that Winn was not issued a written citation for the faulty equipment violation related to the broken side-view mirror.   (Doc. #58 ¶ 11).   Bishop testified, however, that, in the state of Florida, it is within the police officer's discretion to not issue a written citation for a traffic law violation, but merely to issue a verbal warning.   (Doc. #65 at 125).

Additionally, under Florida Statutes Section 316.610 (1):

Any police officer may at any time, upon reasonable cause to believe that a vehicle is unsafe or not equipped as required by law, or that its equipment is not in proper adjustment or repair, require the driver of the vehicle to stop and submit the vehicle to an inspection and such test with reference thereto as may be appropriate.

Here, Bishop testified that the side-view mirror on Winn's Monte Carlo was broken and cracked to such an extent that pieces of the mirror were missing.   (Doc. #65 at 127-28).   Accordingly, due to the fact pieces of the side-view mirror were actually missing, Bishop had reasonable cause to believe that the vehicle was unsafe and not equipped as required by law.   Therefore, the undersigned finds Bishop had probable cause to stop

10

Winn's vehicle.

At the hearing, Defendant made the additional argument that the facts of *U.S. v. Twilley*, 222 F.3d 1092 (9th Cir. 2000) are similar to the case at hand and, thus, his Motion should be granted.  In *Twilley*, however, the office who made the initial stop in that case made a mistake of law when he pulled over a vehicle which he believed was violating the law by not having two licenses plates displayed.  *Id.*  Here, Bishop did not make a mistake of law in believing that driving with faulty equipment was a violation of state law because driving with faulty equipment is, in fact, a violation of Florida Statutes Section 316.610. Defendant's argument fails as a result.

Accordingly, for the aforementioned reasons, the undersigned finds the March 29, 2007 traffic stop was not pretextual or unlawful and that the stop was reasonable under the Fourth Amendment.

## C. Consent

The undisputed testimony of record is that Defendant gave voluntary consent to search his vehicle on February 12, 2007.  (Doc. #65 at 88).  Although Defendant makes much of the fact no marijuana was never recovered from the search of his vehicle, "Nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from *requesting* permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband." *U.S. v. Strickland*, 902 F.2d 937, 941 n. 3 (11th Cir. 1990) (*emphasis in original*).

Here, Bishop told Defendant that he believed he smelled marijuana and asked Defendant if he was carrying any contraband.  (Doc. #65 at 88).  Defendant stated that he was not carrying any contraband and, in response, Bishop asked Defendant if he could search the vehicle.  (Doc. #65 at 89).  Bishop testified that Defendant gave him consent to search the vehicle.  (Doc. #65 at 89).  No evidence to the contrary has been produced by Defendant.  Since the undersigned finds Bishop to be a credible witness, the undersigned finds Defendant consented to the search of his vehicle during the traffic stop on February 12, 2007.[5]

**D. Probable Cause to Believe Contraband was in the Vehicles**

Defendant's alternative argument is that there was no probable cause to believe there was contraband in the vehicles stopped or that the vehicles were being used to facilitate a controlled substance violation.  (Doc. #53 at 4-5).  In support of his argument, Defendant avers that the police informant (Heck) was not trustworthy pursuant to *U.S. v. Angulo-Lopez*, 791 F.2d 1394 (9th Cir. 1986).  The undersigned, however, is not persuaded by this argument primarily because the undersigned finds Heck's information was sufficiently corroborated by Bates in accordance with the court's holding in *Angulo-Lopez*.

Veracity of an informant may be established through independent police corroboration.  *Angulo-Lopez*, 791 F.2d at 1397.  In the instant case, the testimony and evidence of record reveals that Defendant agreed to two separate meetings with a known drug supplier.  (Doc. #65 at 11-13; Exhibits 1, 1(A), 1(B), 1(C); Exhibits 4, 4(A), 4(B), 4(C)).

---

[5] The undersigned notes that Bishop testified that, from the time he stopped Defendant's vehicle, only ten (10) minutes elapsed until he wrote Defendant a citation for having an expired tag violation.

Concerning the February 12, 2007 stop, the information Heck gave to Bates was corroborated by the actions observed by Bates during the surveillance of Defendant's residence.  For example, the Defendant told Heck that he had to drop his child off before going to meet Heck at the predetermined location.  (Doc. #65 at 25).  Shortly thereafter, Bates observed Defendant drop his child off at his residence before driving off in the direction of the arranged drug transaction.  (Doc. #65 at 25-27).  Additionally, Heck accurately predicted the approximate time Defendant would be leaving his residence in order to meet him at the predetermined location.

The United States Supreme Court has held that predicting someone's future behavior is indicative of anonymous tipster's reliability and trustworthiness.  In *Alabama v. White*, the Supreme Court stated:

> What was important was the [informant's] ability to predict respondent's [defendant] *future behavior*, because it demonstrated inside information–a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel [a drug buy location]. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.

496 U.S. 325, 332 (1990) (*emphasis in original*).

In the instant case, the informant was not anonymous, but the undersigned finds the same logic applies.  An informant who is attempting to cooperate to help his own potential sentence would not seem to have incentive to lie about a situation that police will be verifying.  Additionally, Heck accurately predicted Defendant's future actions when he told Bates Defendant would be dropping off his son before leaving to meet him at the predetermined location at a specific time.  Accordingly, the undersigned finds Heck's

trustworthiness and reliability was verified by Bates through surveillance, which corroborated the information relayed to Bates by Heck.

Concerning the March 29, 2007 stop, the record reveals Heck predicted the approximate time Defendant would be leaving his residence to go to the predetermined cocaine buy location. Furthermore, Bates testified that he instructed Heck to tell Defendant that the price of the cocaine was going to be $21,000 by way of coded language, and that Heck, indeed, did this by telling Defendant, "I'm gonna have that little party over there on 21st Street and Phoenix" when, in fact, they were not meeting at 21st and Phoenix since they were to meet at a prearranged location. (Doc. #65 at 46; Exhibit 4(B)).

Moreover, when Defendant was leaving his residence to meet Heck for the arranged cocaine purchase, Bates observed Defendant enter a vehicle carrying a large bag of dog food. Since the JSO narcotics unit found a large amount of money in a bag the first time Heck arranged a meeting with Defendant, thus verifying what the informant had told them, police had additional reason to consider the information Bates received from Heck on March 29, 2007 as especially credible.

### IV. Recommendation

For the aforementioned reasons, the undersigned finds that neither the February 12, 2007, nor the March 29, 2007 traffic stops were pretextual since both stops were made pursuant to a reasonable suspicion that the traffic laws of the state of Florida had been violated. Moreover, the undersigned finds that Defendant gave voluntary consent to search his vehicle during the February 12, 2007 stop and that Winn gave voluntary consent to search his vehicle during the March 29, 2007 stop. Additionally, the undersigned finds that probable cause was present to believe the vehicles in question were being used to facilitate

14

drug transactions and that contraband might be found therein.

Accordingly, the undersigned **RECOMMENDS:**

Defendant's Motion to Suppress Property Seized (Doc. #58) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida this  12th  day of February, 2008.

Copies to all counsel of record
        and *pro se* parties, if any

**THOMAS E. MORRIS**
United States Magistrate Judge